IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SAMSON CONTOUR ENERGY E&P, LLC §
and ENSCO OFFSHORE COMPANY, §
§
    Plaintiffs, §
§
v. §     CIVIL ACTION NO. 4:10-00671
§
LEAM DRILLING SYSTEMS, INC. §
and LIBERTY MUTUAL INSURANCE §
COMPANY, §
§
    Defendants. §

MEMORANDUM AND ORDER

    Pending is Plaintiff's First Amended Motion for Summary
Judgment (Document No. 14). After reviewing the motion, response,
reply, and the applicable law, the Court concludes as follows.

I.  Background

    This is a suit for enforcement of contractual indemnity
provisions under a drilling services contract involving offshore
work. Plaintiff Samson Contour Energy E&P, LLC ("Samson") at all
relevant times was the mineral interest owner of an offshore well
being drilled at South Marsh Island 38 in the Outer Continental
Shelf of Louisiana. Samson entered into a Master Service Agreement
(the "MSA") with Defendant LEAM Drilling Systems, Inc. ("LEAM") on
March 1, 2004, whereby it was "contemplated from time to time
[LEAM] will be requested by Samson to perform certain work and

services," which would be "controlled and governed by the provisions of this MSA."[1] Pursuant to the MSA, Samson via a verbal work order hired LEAM to provide "direction drilling equipment and service onboard the ENSCO 99, a jack-up drilling vessel in the federal waters of the Gulf of Mexico" in order to "effect desired directional control in the drilling of the OCS-G 27878 #F-2 well at South Marsh Island 38."[2]   Plaintiff Ensco Offshore Company ("Ensco") provided the jack-up drilling vessel to drill the well pursuant to its Daywork Drilling Contract with Samson.[3]

During LEAM's drilling operations on the ENSCO 99, David Tuttle, a LEAM employee, allegedly slipped on synthetic drilling mud, fell to the drilling floor, and ruptured discs in his spine.[4] He filed suit against Ensco in the Western District of Louisiana to recover for his injuries; that suit remains pending.[5]   In their First Amended Motion for Summary Judgment, Samson and Ensco assert, and LEAM does not contest, that the contract provisions of the MSA, if enforceable, require LEAM to defend and indemnify Ensco (as a subcontractor of Samson).   They further assert, also without

---

[1] Document No. 14, ex. B-1 at 1 [hereinafter MSA].

[2] Id., ex. B at 1 (Rogers Affidavit).

[3] Id., ex. B-2.

[4] Document No. 14 at 4; id., ex. A.

[5] See Tuttle v. Ensco Offshore Co., No. 6:09-cv-00514 (W.D. La. filed Apr. 2, 2009).

opposition, that the MSA requires LEAM to agree to defend and indemnify Samson against any liability to Ensco that it may incur as a result of its contract with Ensco.[6]

Not addressed by Plaintiffs' motion are their claims that the MSA required LEAM to name Ensco as an additional insured on its insurance policy with Defendant Liberty Mutual Insurance Company ("Liberty Mutual"); that Ensco is an additional insured under Liberty Mutual's policy with LEAM; and their claims for attorneys' fees.[7]  Likewise, LEAM's cross-claims against Liberty Mutual seek defense and indemnity in both the underlying lawsuit and the

---

[6] *See* MSA ¶¶ 16.1, 16.2 (providing for mutual indemnification by one group--Samson and its subcontractors, or LEAM and its subcontractors--to the other group, from and against "all Claims" brought "by or on behalf of the Indemnitor's group" which "arise out of, relate to, or are connected with the Agreement or the performance hereof and relate to bodily injury, illness, or death of any member of the Indemnitor Group."). *See also* MSA ¶ 16.3 (LEAM "agrees to and shall release, indemnify, defend, and hold harmless Samson Group from and against any and all Claims that are brought by or on behalf of any person or entity which arise out of, relate to, or are connected with the Agreement or the performance hereof and relate to . . . the personal injury, bodily injury . . . of any person other than a member of Samson Group . . . ."). "Claims" are broadly defined and include "all claims, losses, damages, costs, expenses, causes of action . . . suits, and liabilities of any and every kind whatsoever . . . including contractual indemnification obligations to other persons or entities."  MSA ¶ 16.1(A).  In <u>Sumrall v. Ensco Offshore Co.</u>, the Fifth Circuit held that similar language validly provided for full indemnity by the employer of an injured worker to the rig operator, and to the rig owner (as the rig operator's sub-contractor).  291 F.3d 316, 320-23 (5th Cir. 2002).

[7] *See* Document No. 1 at 11.

3

present suit.[8]   The Court therefore will address only the declaratory relief Plaintiffs seek with respect to LEAM's indemnity obligations under the MSA.

## II.   Summary Judgment Standard

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(c).   The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).   A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.   Id.   "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."   Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive

---

[8] *See* Document No. 8 at 4.

evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

## III.   Discussion

Samson, Ensco, and LEAM do not dispute the relevant facts; the Court's resolution of Plaintiffs' motion is therefore reduced to a choice-of-law analysis. If Louisiana law applies as surrogate federal law under the Outer Continental Shelf Lands Act ("OCSLA"), the Louisiana Oilfield Anti-Indemnity Act may invalidate the indemnity provision Plaintiffs seek to enforce. But if Federal maritime law applies, then the contractual indemnity provision is

enforceable. *See* Hoda v. Rowan Cos., Inc., 419 F.3d 379, 380 & n.3 (5th Cir. 2005) (citing LA. REV. STAT. ANN. § 9:2780).[9]

For adjacent state law to apply as surrogate federal law under OCSLA, three conditions must be met: (1) The controversy must arise on an OCSLA situs; (2) Federal maritime law must not apply of its own force; and (3) the state law to be applied must not be inconsistent with federal law. Union Tex. Petrol. Corp. v. PLT Eng'g, Inc., 895 F.2d 1043, 1047 (5th Cir. 1990). The parties agree that the controversy arises on an OCSLA situs.[10] Further, the Fifth Circuit has held that nothing in the Louisiana Oilfield Anti-Indemnity Act is inconsistent with federal law. *See* Hodgen v. Forest Oil Corp., 87 F.3d 1512, 1528 (5th Cir. 1996), *overruled on other grounds by* Grand Isle Shipyard, Inc. v. Seacor Marine, LLC, 589 F.3d 778 (5th Cir. 2009) (en banc).

Thus, the sole issue for the Court's determination is whether federal maritime law applies of its own force. If the contract under which LEAM performed the drilling work constitutes a maritime contract, then federal maritime law applies of its own force;

---

[9] The MSA specifies that it is to be interpreted under and governed by Oklahoma state law, except to the extent that general maritime law would otherwise apply, in which case maritime law applies. *See* MSA ¶ 29. However, the MSA's "choice of law provision is of no moment because the parties' choice of law will not trump the choice of laws scheme provided by Congress in OCSLA." Texaco Exploration and Prod., Inc. v. AmClyde Engineered Prods. Co., Inc., 448 F.3d 760, 772 n.8 (5th Cir. 2006).

[10] Document No. 14 at 10 (Plaintiffs); Document No. 19 at 5 (LEAM).

otherwise, it does not, and Louisiana law as applied under OCSLA would invalidate the MSA's indemnity provision.

A.    Composition of the Contract at Issue

"If, as in this case, the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions." Davis & Sons, Inc. v. Gulf Oil Corp., 919 F.2d 313, 315 (5th Cir. 1990).  So, if "an injury occurs in the performance of a separable maritime obligation even though it is provided for by an initial blanket contract that is principally non-maritime, the complete contract is nevertheless subject to maritime law."  Id. at 316.

B.    Whether the MSA and Work Order Are Maritime in Nature

Whether a contract is maritime in nature "depends upon . . . the nature and character of the contract, and the true criterion is where it has reference to maritime service or maritime transactions." Norfolk S. Rwy. Co. v. Kirby, 125 S. Ct. 385, 393 (2004) (quotations and citations omitted).  Courts in this circuit engage in a two-part inquiry to determine whether a contract is maritime:  first, they look to "historical treatment in the

7

jurisprudence," and then they examine six fact-specific factors.
Hoda, 419 F.3d at 381.  The six factors are:

> (1)  what does the specific work order in effect at the
> time of injury provide?
>
> (2)  what work did the crew assigned under the work
> order actually do?
>
> (3)  was the crew assigned to work aboard a vessel in
> navigable waters?
>
> (4)  to what extent did the work being done relate to
> the mission of that vessel?
>
> (5)  what was the principal work of the injured worker?
> and
>
> (6)  what work was the injured worker actually doing at
> the time of injury?

Id. (citing Davis & Sons, 919 F.2d at 316).  In some cases, "the
historical treatment is clear enough to make the second part of the
test 'unimportant.'"  Id. (quoting Demette v. Falcon Drilling Co.,
Inc., 280 F.3d 492, 500 (5th Cir. 2002), *overruled on other grounds
by overruled on other grounds by* Grand Isle, 589 F.3d 778).  The
parties have cited no Fifth Circuit case that addresses whether an
agreement to provide supervision of directional drilling from a
jack-up rig constitutes a maritime contract, and the Court is aware
of none.  However, the Fifth Circuit's treatment of other oil and
gas services on jack-up rigs is "nonetheless suggestive."  Id.

The Fifth Circuit has on several occasions distinguished
maritime and non-maritime contracts in the offshore exploration and

production industry.  Typically, the Court has observed, "the final result turns on a minute parsing of the facts."  Hoda v. Rowan Companies, 419 F.3d 379, 380 (5th Cir. 2005).  It is to these cases that this Court looks for guidance.

To begin with, "wireline services" in an offshore well context are not maritime in nature.[11]  See Dominigue v. Ocean Drilling and Exploration Co., 923 F.2d 393 (5th Cir. 1991); Thurmond v. Delta Well Surveyors, 836 F.2d 952 (5th Cir. 1988).  Wireline services are performed "on land-based wells and offshore wells" alike.  Thurmond, 836 F.2d at 955.  Thus, the services were "peculiar to the oil and gas industry and, viewed apart from the circumstances under which they are performed, are distinctly non-maritime in nature."  Dominigue, 923 F.2d at 396 (citing Thurmond, 836 F.2d at 955-56).  The only connection between the service and navigable waters was the location in which the service was performed, which does not alone make a contract maritime--rather, it is the "nature and character of the contract" that makes it maritime.  Id. (quoting Davis & Sons, 919 F.2d at 316).  The vessel in Dominigue served only as a "work platform," and the fact that it was a vessel was merely "incidental."  Id.  In Thurmond, likewise, the "use of [a] work barge was only incidental to the performance of the

---

[11] "A wireline operation assists on partially drilled oil and gas wells and gathers relevant geophysical data."  Hoda, 419 F.3d at 382 n.5.

contract." <u>Dominque</u>, 923 F.2d at 397 (discussing <u>Thurmond</u>, 836 F.2d at 956).[12]

The Fifth Circuit subsequently distinguished <u>Dominque</u> and <u>Thurmond</u> in addressing other offshore oil and gas services. In <u>Campbell v. Sonat Offshore Drilling, Inc.</u>, 979 F.2d 1115 (5th Cir. 1992), the court held that the provision of casing services aboard a jack-up rig--a vessel--was maritime in nature. The injured worker was a member of a casing crew that used the jack-up rig's "derrick and draw works . . . to accomplish their task," and the crew traveled to the jack-up rig and performed their work from the vessel, "the mission of which was to drill oil and gas wells over navigable waters." <u>Id.</u> at 1123. Indeed, the court in <u>Campbell</u> distinguished <u>Dominque</u> based upon lack of use of the vessel's equipment and the non-integral nature of wireline services to the vessel's primary function of drilling:

> In the absence of evidence that the vessel's equipment was in any way utilized to perform these wirelines services or that these services were significantly related to the vessel's mission, we concluded that the vessel in <u>Dominque</u> merely served "as a work platform" upon which the wireline services were performed and that such services were only incidentally related to the vessel's mission.

---

[12] The rig in <u>Thurmond</u> was a fixed platform. 836 F.2d at 955. Fixed platforms are not vessels. <u>Rodrigue v. Aetna Cas. & Sur. Co.</u>, 89 S. Ct. 1835, 1840-42 (1969). The relevant vessel considered in <u>Thurmond</u> was instead a work barge used by the wireline services contractor. <u>Thurmond</u>, 836 F.2d at 953. In <u>Dominque</u>, on the other hand, the work was performed aboard a movable jack-up rig, which is a vessel. 923 F.2d at 394 n.1, 396.

Id. at 1122 (discussing Dominque, 923 F.2d at 397); see also
Demette, 280 F.3d at 501 (casing work, "an integral part of
drilling, which is the primary purpose of the vessel," was maritime
in nature in view of Fifth Circuit precedent). Similarly, Thurmond
"involved wireline services and maintenance to a structure
characterized as 'a fixed platform' or 'small . . . island' located
within Louisiana's territorial waters," which was therefore
"controlled by jurisprudence establishing that operations performed
on fixed platforms in state waters are non-maritime in nature."
Campbell, 979 F.2d at 1122 (discussing Thurmond, 836 F.2d at 955)
(citations omitted).

More recently, in Hoda, the Fifth Circuit determined that
Campbell "furnish[ed] the critical reasoning" in its conclusion
that the act of torquing up and torquing down blowout-preventer
stacks from a jack-up drilling rig was maritime in nature.   419
F.3d at 382.  Although the torquing crew's "exact work did not
require the use of the vessel," the work nonetheless "could not be
performed without the [vessel's] direct involvement."  Id. at 381,
383.  The "torquing up and down of the bolts on blowout preventer
stacks . . . by itself did not require the use of the vessel or its
crew," but the work "would have been irrelevant and impossible if
the vessel's crew had not used the vessel's rig to set the stacks
and bolts in place."  Devon La. Corp. v. Petra Consultants, Inc.,
247 F. App'x 539, 545 (5th Cir. Sept. 13, 2007) (discussing Hoda,

11

419 F.3d at 381).   Moreover, the Fifth Circuit concluded that torquing up and torquing down blow-out preventers was "an integral part of drilling, which is the primary purpose of the vessel." Hoda, 419 F.3d at 383 (quoting Demette, 280 F.3d at 501).

In sum, crucial to the Fifth Circuit's analysis in Campbell and Hoda is that the work "required the use of a vessel as such," see Devon La. Corp., 247 F. App'x at 544, rather than the use of a "work platform" that merely happens to be a vessel.  See Dominque, 923 F.2d at 397.

Two district court opinions from the Eastern District of Louisiana are also instructive.  In Gilbert v. Offshore Production & Salvage, Inc., the court found that a contract to provide drilling supervision services was maritime in nature.  Nos. 95-122, 95-2361, 95-3285, 1997 WL 149959, at *4-5 (E.D. La. Mar. 21, 1997), aff'd 134 F.3d 368 (5th Cir. 1997) (unpublished op.).  The contract at issue required the provision of "wellsite supervision and engineering services for the tie-back and completion of four wells/caissons," and the injured worker's job was to "coordinate[] the efforts of the various contractors engaged in the subject work and that of the [vessel] thereby significantly contributing to the mission of that vessel."  Id. at *5.  In Gautreaux v. Tetra Applied Technologies, LLC, on the other hand, the act of inspecting and replacing seal rings of removed tubing from an offshore well was not maritime in nature.  No. 08-4645, 2010 WL 1930925, at *5-7

(E.D. La. May 10, 2010). The court compared the facts before it to
Thurmond, Davis, Dominque, Campbell, Demette, and Hoda. *See* id. at
*3-6. It concluded that, although the purpose of the seal ring
inspection and replacement was to further the act of drilling,
which was integral to the vessel's function, the act of inspection
and replacement was wholly "'self-contained' and [did] not require
a vessel and crew for completion." Id. (quoting Hoda, 419 F.3d at
383). The court noted that finding all activities that are
necessary to drilling--the vessel's mission--to be maritime in
nature would contradict Hoda, which specifically rejected the
argument that "oil and gas services contracts are maritime in
nature whenever they contribute to the mission of the jack-up
drilling rig." Gautreaux, 2010 WL 1930925, at *6 (quoting Hoda,
419 F.3d at 383).

The present case is more closely analogous to Campbell,
Hoda and Gilbert. The uncontroverted affidavit of John Rogers,
Technical Manager of Samson Investment Company, who joined "the
Samson group of companies in 1978 as a drilling engineer,"
thoroughly explains LEAM's role in directional drilling aboard the
ENSCO 99.[13] Tuttle was one of two directional drilling consultants
assigned to supervise the directional drilling being performed
onboard the ENSCO 99. Tuttle and his counterpart "began their
supervision of the directional drilling work process when the well

_____

[13] Document No. 14, ex. B at 1 (Rogers Affidavit).

13

reached a depth of 1,023 feet on about March 15, 2007."[14]   LEAM
supplied directional drilling equipment, which steers the drill bit
at a specific angle down the well, and supervisory services.  Under
Tuttle's supervision, the mud motor (to allow directional control
of the bit) and a measurement while drilling (MWD) device were
added to the drilling string above the bit and sent down into the
hole or well bore to guide the drill bit.[15]  The use of LEAM's mud
motor and MWD on the drilling string "required the use of ENSCO
99's draw works, derrick, pumps, drill string and other rig
equipment to lower Leam's equipment into the hole and cause Leam's
equipment to function."[16]   Moreover, directional drilling was
integral to the vessel's function--it was included as part of the
plan for drilling the well in the first place.[17]

The ENSCO 99 therefore was not merely a "work platform."  *See*
Domingue, 923 F.2d at 397.  Instead, Tuttle's supervision of the
directional drilling could not be accomplished without the
concurrent involvement of "the rig's derrick and draw works."
Hoda, 419 F.3d at 382.  Thus, the case law suggests that the
contract work being performed here by LEAM and Tuttle was
"'inextricably intertwined' with the 'maritime activities' of the

---

[14] Id., ex. B at 2.

[15] Document No. 14, ex. B at 2.

[16] Id.

[17] Id., ex. B at 3.

14

rig and its crew," which would make it maritime in nature.  *See* id.
at 382 (quoting Campbell, 979 F.2d at 1123).[18]

Application of the six-factor test, informed by the analogous
case law, demonstrates that the MSA and relevant work order
comprise a maritime contract.  The parties do not dispute that,
pursuant to the work order, LEAM was to provide only directional
drilling services aboard the ENSCO 99, a jack-up rig, which is
considered a vessel.  LEAM actually provided those services, and
Tuttle was supervising the directional drilling--his principal
work--at the time of his injury.[19]  The crux of the inquiry is thus
whether directional drilling on a jack-up rig relates "to the
mission of that vessel."  Davis & Sons, 919 F.2d at 316; *see also*
Hoda, 419 F.3d at 382-83 (focusing on relation of work to the
purpose of the jack-up rig on which it was performed).  As
discussed above, the "historical treatment in the jurisprudence" of

_____

[18] In fact, the summary judgment evidence is that on the
occasion of his injury, Tuttle

was standing on the rig floor looking down through the
rotary table to observe the fluid level in the hole as
each stand (90' length) of drill pipe was beginning to be
removed from the hole.  The purpose of observing the
fluid level is to determine and announce whether the
fluid level is rising in the hole, staying constant, or
falling so that action can be taken to correctly manage
the well.  As the ENSCO drilling crew began removing a
stand from the hole, Tuttle began to step back, slipped,
and fell.

Doc. No. 14, ex. C ¶ 4.

[19] Document No. 14, ex. A at 2; id., ex. B at 2.

contracts for oil and gas services on jack-up rigs counsels that the directional drilling work at issue here related directly to the mission of the ENSCO 99, and required use of the drilling vessel as more than a mere platform.

Because the MSA is a maritime contract, federal law, not Louisiana law, controls.  The indemnity clause of the MSA is therefore valid and enforceable.  Pursuant to Paragraphs 16.1-16.3 of the MSA, LEAM is required to indemnify Ensco for the claims alleged in Tuttle's suit, and to indemnify Samson for the contractual indemnity, if any, that Samson owes to Ensco. Therefore, remaining before the Court are: Plaintiffs' claims for declaratory judgment relating to LEAM's obligation to name Ensco as an additional insured under the MSA, and to Ensco's coverage under Liberty Mutual's insurance policy with LEAM; Plaintiffs' claims for attorneys' fees; and LEAM's claim that Liberty Mutual is obligated to defend and indemnify it against all claims in both the underlying lawsuit and the present suit.

## IV.  Order

Based on the foregoing, it is

ORDERED and ADJUDGED that Plaintiff's First Amended Motion for Summary Judgment (Document No. 14) is GRANTED, and it is DECLARED that

16

1.   Defendant LEAM Drilling Systems, Inc. has a contractual duty
     to defend and indemnify Ensco Offshore Company for the claims
     brought by David Tuttle in the underlying lawsuit in the
     Western District of Louisiana, <u>Tuttle v. Ensco Offshore Co.</u>,
     Cause No. 6:09-cv-00514; and

2.   Defendant LEAM Drilling Systems, Inc. has a contractual duty
     to indemnify Samson Contour Energy E&P, LLC for its defense
     and indemnification obligations owed to Ensco Offshore Company
     pursuant to the underlying lawsuit in the Western District of
     Louisiana, <u>Tuttle v. Ensco Offshore Co.</u>, Cause No. 6:09-cv-
     00514, but only to the extent that Samson Contour Energy E&P,
     LLC, and not LEAM Drilling Systems, Inc., provides indemnity
     and defense to Ensco Offshore Company in the underlying
     lawsuit.

     The Clerk will enter this Order, providing a correct copy to
all counsel of record.

     SIGNED at Houston, Texas on this _7TH_ day of December, 2010.


                                     _____
                                          EWING WERLEIN, JR.
                                     UNITED STATES DISTRICT JUDGE

17